TOWN OF PIERREPONT, RESPONDENT, *v.* WILLIAM D. LOVELASS AND OTHERS, APPELLANTS.

*Capacity of plaintiff to sue — objection waived if not taken by answer or demurrer — Bridge maintained by town — damages to — Illegal act — responsibility for, cannot be avoided by contracting with other parties to do it.*

An objection to the capacity of a plaintiff to maintain an action, if not taken by demurrer or answer, is waived.

When a town acquires by legislative sanction, from a turnpike company, the right to maintain a bridge, such right becomes an easement, the property of the town, and the town may maintain an action to recover damages for injury caused to such bridge.

A person cannot, by contracting with others to do an act of which the natural consequence is unlawful damage to another, shield himself from responsibility therefor.

APPEAL from a judgment in favor of the plaintiff, entered upon the report of a referee.

The action was brought to recover damages alleged to have been caused by the negligence of the defendants in running saw-logs down the Racket river, whereby the plaintiff's bridge over said river was carried away.

The referee, among other things, found that, on the 10th day of April 1810, by chapter 124 of the Session Laws of that year, the legislature of the State of New York incorporated certain persons by the name of "The President and Directors of the St. Lawrence

Turnpike Road Company." The object of the corporation, as declared by said act, was the making of a turnpike from a point on the State road along the south side of Black river to the town of Malone, Franklin county. The act was amended by chapter 53 of the Laws of 1811, and again by chapter 158 of the Laws of 1812. The road constructed by said corporation was known as the "Russell turnpike," and crossed the Racket river, in the township now known as Pierrepont, near the western line of the town of Parishville. The town of Pierrepont was organized in 1818.

The preamble of chapter 154 of the Laws of 1822, recites that the said corporation, "under their corporate seal, do consent and agree to relinquish all that part of a turnpike road passing through the county of St. Lawrence, * * * and all that part of said turnpike road leading through the county of St. Lawrence is given up to the inhabitants of the several towns in the said county of St. Lawrence for a public highway." And the act provides "that the commissioners of highways of the several towns in said county of .St. Lawrence, through which the said turnpike road passes," shall lay the same out into highway districts "and assess and apportion the labor and money on roads and bridges in the same manner as if said turnpike road had been legally laid out by commissioners of highways;" and the second section of that act released the corporation "from all laws relating to that section of said turnpike road within the county of St. Lawrence."

It did not appear by the evidence at what time a bridge was first erected across the Racket river at the point of its intersection with the turnpike road, but for more than forty years previous to the 5th day of May, 1867, a bridge had been maintained at such place by the town, connecting the parts of said highway separated by the river, and forming a part of said highway. During that period the town had constructed at this point four or five different bridges, one of which was built about 1838, one in 1849, one in 1853, and one in 1861. They were all built on the same location, the position of the abutments and piers not having been changed, except that in 1853 the eastern abutment was placed about half its width further down the stream. The latter bridge stood till the 5th day of May, 1867, when it was carried away and destroyed by logs of defendant's being carried down the river and against the

bridge, certain parties being employed under contract with defendant to drive such logs down the river.

On the 10th of April, 1850, the legislature (chap. 264) passed an act declaring the Racket river " a public highway for the purpose of floating logs and lumber from its mouth, in the town of Massena, to the foot of Racket lake, in the county of Hamilton." The act provided no compensation to riparian owners.

*Parker & McIntyre*, for the appellants.

*Sawyer & Russell*, for the respondent.

BOARDMAN, J. :

Various reasons are urged why this judgment should be reversed. I will proceed to notice them in their order.

First. It is alleged that the town was not the owner of the bridge destroyed, in such a legal sense as to enable it to maintain this action in the name of the " Town of Pierrepont."

The complaint says plaintiff was the owner of the bridge. The answer contains a general denial. In no other way is the right of plaintiff to maintain this action in its present form questioned. By reference to sections 144 and 148 of the Code, it would seem that any objection to the capacity of plaintiff to maintain this action was waived, inasmuch as the defendants neither demurred nor set up by answer any such defense. (*Fulton Fire Ins. Co.* v. *Baldwin*, 37 N. Y., 648.) The defendants, having waived any objections to the rights of the plaintiff to maintain this action, are concluded thereby, and if a cause of action has been established by the evidence upon the trial, the plaintiff may recover. (*Seaton* v. *Davis*, 1 N. Y. S. C., 91; *Wright* v. *Wright*, 54 N. Y., 437.) Aside from this answer to the objection, the referee has found that the town was the owner of the bridge destroyed, and had capacity to maintain the action. Such conclusion is sustained, I think, by the evidence and the law. The town takes in its name, by virtue of any conveyance of lands within its limits, in any manner for the use or benefit of the inhabitants of such town. (1 R. S. [Edm. ed.], 310, § 3 ; 2 Wend., 109.) The turnpike company owned this highway and the right to maintain a bridge across the Racket, as a part

of such highway, at the place where this bridge stood. By chapter 154 of the Laws of 1822, it is alleged that the turnpike company released this road to the inhabitants of the town, whereby the town became the owner, not in the ordinary manner, but by succession to the rights of the turnpike company. The fact that the highway was laid out in districts, and was managed by the commissioners of highways, does not affect the question of title in plaintiff. So far as the bridge in question is concerned, it was maintained by the whole town, from taxes levied upon all its inhabitants, as a matter of convenience. In this view it becomes unnecessary to determine whether the commissioners of highways or other town officers can, in ordinary cases, bring such an action as this, or whether it must be brought in the name of the town. The town acquired the right to maintain this bridge of the turnpike company, with the legislative sanction. The right thus acquired becomes an easement, and is the property of the town; and, in my judgment, the referee was correct in holding that the town could maintain the action.

Second. There is no evidence in the case from which we can say, as a conclusion of law, that the plaintiff was guilty of contributory negligence. The referee finds that there was none. The overseer of highways has no care over or duties in respect to bridges. Notice to him was not notice to the town. (*Bush* v. *Trustees of Geneva*, 3 N. Y. S. C., 409; *Bartlett* v. *Crozier*, 17 Johns., 439, 447.)

Third. The referee has found that the bridge was properly constructed. This is claimed to be error. If the defendants had no right to run logs down the river as a public highway, they are not in a situation to raise such a question. They would be wrong-doers, and, however defective plaintiff's structure, the defendants would be liable for any injury to it. The plaintiff was only bound to protect its bridge against dangers legally threatening its existence. But the evidence sustains the findings of the referee. The bridge was well constructed, of proper dimensions, and of suitable materials, heighth and strength. It had proved sufficient for many years. It would be extravagant for the court, upon the evidence, to hold that the bridge was so negligently constructed as to deprive plaintiff of its recovery in this action.

Fourth. After the logs were placed by defendants upon the ice in the river, they employed certain persons to run them down the

river when the spring freshets came, contracting to pay five cents per log for the service. Defendants claim these parties (Snell and Douglass) thereby became contractors and alone liable for any damage done by the negligent or careless running of the logs. What Snell and Douglass agreed to do, was, to run such logs as defendants had or should put into the river. The defendants were to set the logs afloat. After they were afloat, Snell and Douglass were to run them; that is, they and their men were to remain behind to pick up and keep in the channel stranded logs, and break up and forward any jams that might occur. Snell and Douglass were in no proper sense contractors. They were laborers for hire no less than if they had been paid by the day for the work. The payment by the piece secured greater fidelity and industry, but did not change the character of their employment. If, however, Snell and Douglass can be deemed contractors, I do not think the defendants would be relieved of responsibility for their negligence. The act which they were employed to do was unlawful, since, as we shall see, Racket river was not a public highway. (*Congreve* v. *Smith*, 18 N. Y., 79.) They were employed by defendants to do such act. The dangers arising therefrom were the natural consequences of the thing to be done. It was the duty of the defendants to provide against or prevent such consequences. By simply contracting with others to do the dangerous act, the defendants do not relieve themselves from its consequences. (*Creed* v. *Hartmann*, 29 N. Y., 591; *Storrs* v. *City of Utica*, 17 id., 105.) Besides, these defendants put the logs in the river; this was the primary source of the mischief, without which the injury would not have happened. The natural action of the water might, and probably did, produce the injury, independently of the action of Snell and Douglass. The large mass of the 200,000 logs, doubtless was carried down by the force of the current alone. Thus, defendants' conduct led directly, we might say, in view of the result, necessarily to the injury. For such direct act defendants are liable (*Jones* v. *Chantry*, 4 N. Y. S. C., 63), even though other acts set in motion by them concurred in the result. (*Pollett* v. *Long*, 56 N. Y., 200.)

Fifth. In the case of *Morgan* v. *King* (35 N. Y., 454), the court declared the law, making the Racket river a public highway,

unconstitutional, and held upon the facts then before the court, that such river, above Potsdam, was not in fact a public highway, and was not the subject of a public easement. The facts proved in that case, so far as we can judge from the report, were not essentially different from those here given in evidence. Applying the law of that case to the facts before us now, and it is evident that decision is conclusive. But the defendants insist that the town is not a riparian owner, and is not, therefore, in a situation to urge the invalidity of the law, declaring the river a public highway, for want of compensation to owners of the adjacent soil. Such claim is founded on the erroneous assumption that the town had no vested right to use the banks and bed of the river to maintain the bridge. For over forty years the town has maintained such a bridge at the same point. If necessary, a dedication might be presumed, since an easement may be so acquired. But we have already seen that the plaintiff acquired a vested right from the turnpike company in 1822. As a consequence the acts of 1850 and 1851 were void, so far as they affected the plaintiff in the absence of compensation, and the defendants took no rights by said acts as against the plaintiff's prior rights. The findings of the referee in his exhaustive and elaborate report, and the law applicable to the case, make it quite conclusive that the Racket river, at and above the point where this bridge was, is not a public highway, much less a navigable stream.

It is unnecessary to consider in detail the exceptions taken upon the trial. Many of them are sufficiently answered in the previous discussion.

The offer to show that a square headed pier was of an improper form, was properly rejected, because it was an opinion upon a state of facts which any person, however inexperienced, was equally competent to form; it was not a question for experts; and for the further reason that plaintiff's counsel had admitted, as appears by the case, that an "A" shaped pier would "shunt" off logs better than a square end pier. Whatever force could have come from the evidence, had therefore been conceded, and did not require proof.

The offer to show that there was no other existing outlet to market for lumber growing in the valley of the Racket, and that there were large quantities above this bridge, was properly rejected.

It may be that "necessity knows no law," still, necessity does not ordinarily exempt parties from the consequences of their acts. It is not necessary that parties should buy logs or land where there is no means of reaching or removing the timber except by trespassing upon the rights of others. So far as such evidence tended to justify the making of the Racket a public highway, it is answered by the other facts in the case, showing that it is not and cannot be made such under our laws.

The trial of this case has apparently been conducted with great care, labor and skill; the report of the referee bears evidence of his industry and faithfulness in the discharge of his duties; and the result to my mind is just and proper. After a careful consideration of the learned arguments of counsel upon this appeal, I can see no good reason why a new trial should be had. The judgment should be affirmed, with costs.

JAMES, J.:

I concur with Justice BOARDMAN in the result, and in all of his opinion except that portion which holds that the Racket river is not a highway; from that I dissent. I am of the opinion that the reverse is the law, notwithstanding the case of *Morgan* v. *King* (35 N. Y., 454).

LEARNED, P. J.:

I agree with the result of my brother BOARDMAN's opinion; but I do not think it necessary to pass on the question, whether or not the Racket river is a public highway, so far as concerns the right to float logs.

It is found by the referee that the bridge was of reasonable form and sufficient strength, with reference to any reasonable use of the channel in floating logs and lumber, and that the destruction of the bridge was caused by the negligence of the parties in charge of the drive; that no men were sent ahead to prevent jams. The defendants put the logs in the river, and, by not taking precautions against jams, caused the injury. They were liable for their negligent acts.

Judgment affirmed, with costs.